PHILLIP A. TALBERT
United States Attorney
STEVEN S. TENNYSON
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for the United States

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel*. EDWARD POLLARD, <br><br> Plaintiff, <br><br> v. <br><br> THEODORE WORKMAN, JR; LEONARD SOLONIUK; and SOLONIUK PAIN CLINIC, a Medical Corporation; <br><br> Defendants. | Case No. 2:19-cv-0325 MCE DB <br><br> **COMPLAINT IN INTERVENTION** <br><br> **JURY TRIAL DEMANDED** |

The United States brings this action against Defendants Theodore Workman, Jr., Leonard Soloniuk, and their clinic, Soloniuk Pain Clinic, a Medical Corporation, to recover damages and civil penalties for submitting claims to Medicare for drug tests they knew violated Medicare's requirements. Defendants' conduct violated the False Claims Act, 31 U.S.C. §§ 3729-33, and also entitles the United States to relief under the doctrines of payment by mistake and unjust enrichment. Having filed a notice of partial intervention pursuant to 31 U.S.C. § 3730(b)(4)(A), the United States alleges as follows:

## I. INTRODUCTION

1.  Between 2015 and 2018, Dr. Soloniuk and Dr. Workman jointly owned the Soloniuk Pain Clinic located in Redding, California. The Clinic specialized in treating chronic pain and often ordered urine drug tests, which, when used appropriately, provide medically useful information to clinicians about the amount of a particular substance in a patient's system.

2.  Dr. Soloniuk and Dr. Workman knew that to be legally entitled to Medicare reimbursement for those tests, they had to comply with Medicare's regulations, which, at all times

relevant to this Complaint, required diagnostic tests to be based on individualized need.

3. Defendants did not comply with those regulations. Instead, after discovering that Medicare would reimburse them based on the number of drugs tested, Dr. Soloniuk and Dr. Workman devised a plan to test every Medicare patient for *just enough* drugs to claim the highest reimbursement, regardless of medical necessity. In December 2015, Dr. Soloniuk discovered this threshold amount was twenty-two drugs, calculated his expected payout, and then directed his staff: "We need to do the 22 testing areas." The Clinic's lab manager responded: "I agree to test for only 22 classes." After that, Defendants virtually always tested Medicare patients for the same twenty-two drugs, even when nothing in patients' medical records indicated the need for that testing.

4. The Clinic employed a variety of schemes to cause its staff to order these excessive urine drug tests. First, it accomplished its goal of maximizing reimbursement by adding unnecessary drugs, which they called "fillers," to their drug testing panel, and then testing virtually every Medicare patient for the same combination of fillers. These fillers included obscure drugs that no patients ever tested positive for, that the patients were not suspected of taking, and that some of the Clinic's providers could not even recognize, making it impossible for them to have made the required assessment that testing for those drugs was warranted in each case.

5. Second, the Clinic directed its staff to adhere to a treatment "algorithm"—essentially a decision tree—and then monitored their activities to ensure they complied.  For Medicare patients, the algorithm was straightforward: test for twenty-two drug classes—no exceptions. This practice ensured that the Clinic's providers did not perform the individualized assessment Medicare requires. Instead, they routinely tested for twenty-two drug classes, disregarding patients' unique medical needs.

6. Third, although Defendants ostensibly ordered these expensive tests as a follow-up to an initial round of "screen" testing, they did not use the screen tests to screen out patients. Instead, they ordered these expensive tests before they had even obtained the screen results. This made it impossible for Defendants to have considered the screen test results in deciding whether to order more testing or narrow the scope of that testing. As a result, billing Medicare at the maximum level for twenty-two drug classes was a foregone conclusion.

7. Defendants knew that these blanket, medically unnecessary tests were illegal. They were

warned multiple times, by consultants, outside laboratory providers, and regulators. For instance, a Medicare contractor audited the Clinic's claims and delivered a comprehensive presentation to Dr. Soloniuk and Dr. Workman, during which the contractor warned them in no uncertain terms that they needed to order tests on an individualized basis. Shortly afterward, the Clinic's billing consultant reiterated this rule to Defendants and cautioned them to stop billing the highest level "ALWAYS." Despite these warnings, Dr. Soloniuk and Dr. Workman continued testing every patient at the highest level.

## II. PARTIES

8.     Plaintiff is the United States of America. Through its agencies, the United States administers healthcare programs for qualifying beneficiaries. More specifically, the Department of Health and Human Services ("HHS") and its component, the Centers for Medicare and Medicaid Services ("CMS"), administer the Medicare program.

9.     Defendant Soloniuk Clinic d/b/a The Pain Solution Center (the "Clinic"), is a medical corporation incorporated under the laws of the State of California with its principal place of business in Redding, California.

10.     Defendant Theodore Workman, Jr. is a medical doctor who specializes in pain medicine and who, at all times relevant to this action, co-owned, practiced, and set policy for the Clinic.

11.     Defendant Leonard Soloniuk is a medical doctor who specializes in pain medicine and who, at all times relevant to this action, co-owned, practiced, and set policy at the Clinic.

## III. JURISDICTION

12.     This action arises under the False Claims Act and the common law. This court has subject matter jurisdiction over this action under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331, 1345, and 1367(a).

13.     This Court has personal jurisdiction over Defendants, who transacted business in the Eastern District of California, and whose alleged misconduct occurred in this District.

14.     Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to these claims occurred within the Eastern District of California.

15.     Relator Edward Pollard, who originally filed this action on behalf of the United States

under 31 U.S.C. § 3730(b), is an individual who resides in Redding, California. From April 2016 to February 2018, Pollard worked as the General Supervisor of the Clinic's laboratory.

## IV. LEGAL BACKGROUND

### A. The False Claims Act

16. The False Claims Act is the primary civil remedial statute designed to deter fraud upon the United States and reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986), 1986 U.S.C.C.A.N. 5266.

17. A defendant violates the FCA when it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B).

18. Under the FCA, a claim includes a request for money. *Id.* § 3729(b)(2). If the person submitting the claim was not entitled to payment, then a claim is false under the FCA.

19. To show that a person acted "knowingly" under the False Claims Act, the United States must prove that the person, with respect to information: (1) had actual knowledge of the information; (2) acted in deliberate ignorance of the truth or falsity of the information; or (3) acted in reckless disregard of the truth or falsity of the information. *Id.* § 3729(b)(1). The United States does not have to prove that the person had the specific intent to defraud. *Id.*

20. Under the FCA, the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

### B. Applicable Medicare Program Rules

21. In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C § 1395 *et seq.*, known as the Medicare program. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426-1.

22. The Medicare program consists of four parts: A, B, C, and D. Defendants billed Medicare under Part B, which covers certain medical services, including clinical laboratory test services. 42 U.S.C. § 1395k(a)(2)(B).

23. CMS administers the Medicare program. It contracts with private companies, most commonly Medicare Administrative Contractors, to act as agents in reviewing and paying claims submitted by health care providers. 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104. At all times relevant to this case, Noridian Healthcare Solutions, LLC ("Noridian"), was the Medicare Administrative Contractor responsible for processing Medicare Part B claims in California, including the claims submitted to Medicare by Defendants.

24. To participate in the Medicare program, Defendants were required to and did submit a Medicare Enrollment Application. Medicare regulations require providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations. 42 C.F.R. § 424.516(a)(1). In the Enrollment Application, an authorized official from the provider must sign the "Certification Section," which "legally and financially binds [the] supplier to all of the laws, regulations, and program instructions of the Medicare program." *See, e.g.*, Form CMS-855A. Officials for the Clinic signed the certification statement, indicating that Defendants understood Medicare laws, regulations, and program instructions and promised to comply with them.

25. To obtain Medicare reimbursement for certain outpatient items or services, medical providers, like Defendants, typically submit an electronic claim. Among the information the provider includes is codes that identify the services rendered and for which reimbursement is sought, and the unique billing identification number of the "rendering provider," who provided the services.

26. The Clinic performed all of its tests at facilities in California. It submitted all of its claims for payment to Noridian under its agreement that it had complied with Medicare's requirements.

### 1. The Medicare Program's Regulations for Laboratory Tests

27. Medicare regulations make clear that laboratory tests must be ordered for the treatment of a specific illness or injury. Laboratory test orders that are not individualized to patient need (or for which the need is not documented in the patient chart) are not covered services, and claims for such services must be denied.

28. Medicare Part B pays for covered diagnostic laboratory tests that are furnished by a laboratory. 42 C.F.R. § 410.32(d)(v). "Clinical laboratory services involve the . . . examination of materials derived from the human body for the diagnosis, prevention, or treatment of a disease or

assessment of a medical condition." Medicare Benefit Policy Manual ("MBPM"), (Pub. 100-02), Ch. 15, § 80.1. (Available at https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/ bp102c15.pdf) (Last accessed Nov. 29, 2023).

29. But Medicare only covers services, including diagnostic laboratory services, that are reasonable and necessary for the diagnosis or treatment of an illness. *See* 42 U.S.C. § 1395y(a)(1)(A) ("[N]o payment may be made under [Medicare] part A or part B . . . for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]").

30. Pursuant to 42 C.F.R. § 410.32(a), all diagnostic tests "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's *specific medical problem*." (emphasis added).

31. The MPBM's "Requirements for Ordering and Following Orders for Diagnostic Tests" define an "order" as "a communication from the treating physician/practitioner requesting that a diagnostic test be performed for a beneficiary . . . . [T]he physician must clearly document, in the medical record his or her intent that the test be performed." MPBM, Ch. 15, Section 80.6.1.

32. Clinical laboratory services must be ordered and used promptly by the physician who is treating the beneficiary as described in 42 C.F.R. § 410.32(a). MPBM, Ch. 15, § 80.1.

33. In order to assess whether laboratory diagnostic services are reasonable and necessary and whether reimbursement is permitted, Medicare requires proper and complete documentation of the services rendered to beneficiaries. 42 U.S.C. § 1395l(e); *see also* 42 U.S.C. § 1395u(c)(2)(B)(i) ("The term 'clean claim' means a claim that has no defect or impropriety (including any lack of any required substantiating documentation"). Critically, Medicare regulations expressly state that a laboratory's claim for a service will be denied if there is not sufficient documentation in the patient's medical record to establish that the service was reasonable and necessary. 42 C.F.R. § 410.32(d)(3).

### 2. Reimbursement for Urine Drug Tests

34. Drug testing identifies the presence or absence of drugs in a patient's body. Urine drug tests, the most common method, can be "screen" tests or "definitive" tests. Generally, under the

prevailing standard of care, clinicians order a quick, inexpensive screen test and, if the results are unexpected, they order a subsequent definitive test, which is both more accurate and more expensive, to confirm those results.

### a. Screen Tests

35. Screen tests typically happen in a physician's office. They often use a method called an "immunoassay" to find out whether a drug is present above a certain concentration level.

36. One common method of screen tests is drug test cups, which use built-in test strips. Another is an immunoassay analyzer machine, which is more sophisticated and generally reimbursed at a higher level than screen tests performed with test cups.

37. From January 2016 through early 2018, the Clinic administered screen tests with an immunoassay analyzer machine, and then, in early 2018, the Clinic began using drug test cups for Medicare patients.

38. Screen tests are the standard of practice for drug testing in pain management. Most patients need only limited, if any, definitive testing, based on their screen test results, drug abuse history, and clinical presentation.

### b. Definitive Tests

39. In contrast, definitive testing is done in a lab. These tests, often using advanced techniques, yield precise results identifying the concentration of a drug in a sample. These tests can be used to "confirm" screen test results, as they use a more accurate methodology.

40. The clinical value of the Clinic's definitive laboratory testing depends on each patient's unique medical condition, clinical history, and presentation, as assessed and documented by the Clinic healthcare provider.

41. It also depends on whether the screen test is expected or unexpected. For example, if a patient is prescribed Xanax, which is a benzodiazepine, a positive test result for benzodiazepines would be expected. But if the screen test result is negative for benzodiazepines, and the patient insists that they are taking their Xanax as prescribed, a definitive test to "confirm" this unexpected result may be reasonable and necessary. Similarly, if a patient's screen test shows a positive result for an illicit drug, then a definitive test to confirm this unexpected positive result may be reasonable and necessary.

7

42.     If that patient's screen test results are expected and patient-specific indications (like their presentation) do not suggest drug abuse, then a definitive test for benzodiazepines is not reasonable and necessary. That test is not covered by Medicare because it is not necessary for the treatment and diagnosis of that patient.

c.     *Practice Guidelines*

43.     Several organizations have published guidelines regarding drug tests in the clinical setting. These guidelines generally advise administering a screen test first and then referring any unexpected results for definitive testing.

44.     For instance, the *American Society of Interventional Pain Physicians*, of which Dr. Soloniuk was a member, had long recommended referring only unexpected screen test results for a narrow range definitive testing.

45.     No guidelines recommend the routine use of definitive testing for virtually every patient for the exact same combination of twenty-two drugs, as Defendants did here.

46.     At all times relevant to this Complaint, both Dr. Workman and Dr. Soloniuk were familiar with and understood these guidelines.

d.     *The Local Coverage Determination*

47.     Consistent both with Medicare's requirement that medical care be individualized as well as the prevailing standard of care, in November 2015, Noridian issued a Local Coverage Determination ("LCD") entitled *Controlled Substance Monitoring and Drugs of Abuse Testing (L36668)*. (Available at https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=36037&ContrId=275) (Last accessed Nov. 29, 2023).

48.     The LCD, which was effective and applicable at all times relevant to this Complaint, expressly stated that Medicare will only pay for tests based on patient-specific assessments:

a)     The LCD confirmed that "Blanket Orders," which it described as an "identical order for all patients in a clinician's practice without individualized decision making at every visit," are "Non-Covered Services."

b)     The LCD confirmed that "[r]outine standing orders for all patients in a physician's practice are not reasonable and necessary."

49. The LCD also stated that: "Definitive [urine drug testing] may be reasonable and necessary based on patient specific indications, including historical use, medication response, and clinical assessment, when accurate results are necessary to make clinical decisions. The clinician's rationale for the definitive [urine drug testing] and the tests ordered *must be documented in the patient's medical record*." (emphasis added.)

50. Defendants knew that Medicare did not cover all tests that a physician orders. As Defendants were aware, to be legally entitled to Medicare reimbursement for these tests, they had to comply with Medicare's regulations.

51. Defendants were repeatedly informed of Medicare's requirements governing urine drug testing. For example, in 2014, they received a notice from the Clinic's outside laboratory service provider, stating that "Medicare will only pay for tests that meet the Medicare coverage criteria and are medically necessary for the diagnosis or treatment of the individual patient." The warning continued: "Tests used for routine screening of patients without regard to individual need are not usually covered by Medicare."

52. Dr. Workman and Dr. Soloniuk have acknowledged that, at all times relevant to this Complaint, they were aware of and understood Medicare's requirements and the LCD.

## V. THE FRAUDULENT SCHEMES

53. The Clinic devised multiple schemes to cause its providers to order excessive and medically unnecessary drug tests for its patients, despite knowing that Medicare required these tests to address the patient's specific medical problem.

### A. Unnecessary Filler Drugs

54. One of the methods Defendants used to accomplish their fraudulent goal of reaching the maximum reimbursement was to add unnecessary drugs they called "fillers" to their testing panel, and then testing virtually every Medicare patient for the same combination of "fillers."

55. Defendants knew the unnecessary filler drugs were non-existent in the patient population. In February 2015, Dr. Workman and Dr. Soloniuk published a retrospective study summarizing the Clinic's urine drug test results, intending to help other clinicians design a testing panel. They presented their study at a professional conference in or around April 2015. Their study found none of their patients

had tested positive for several of the filler drugs and suggested that the filler drugs should not even be included on the Clinic's drug testing panel, let alone tested in every instance.

56. Months later, in December 2015, Defendants discovered that CMS had announced changes to the reimbursements for urine drug tests for the upcoming year.

57. As Dr. Soloniuk summed up in a December 2015 email to Dr. Workman and other staff, each screen test would now receive an $80 reimbursement, and the reimbursement for definitive tests would vary depending on the number of the drugs tested. Testing at least twenty-two drug classes resulted in the highest reimbursement, $215.08, according to a table that Dr. Soloniuk copied and pasted into the email:

| Drugs Tested | Reimbursement | Code |
|:---:|:---:|:---:|
| 1-7 | $80 | G0480 |
| 8-14 | [left blank] | G0481 |
| 15-21 | $166 | G0482 |
| 22+ | $215.08 | G0483 |

58. In that same email, Dr. Soloniuk instructed his staff: "We need to do the 22 testing areas." He reasoned that, because the Clinic can charge $80 for each screen test and $215.08 for each definitive test for at least 22 drugs under the G0483 code, "our collections per Medicare [patient] would be 215.08 + 80 = 295.08." Neither Dr. Workman nor Dr. Soloniuk gave any advisement that staff should only order testing as was reasonable and medically necessary for a specific patient. Instead, every Medicare patient would receive the combination of tests that resulted in the maximum reimbursement.

59. In response to Dr. Soloniuk's email, the Clinic's lab manager stated: "I agree to test for only 22 classes."

60. After reaching the agreement to test "for 22 classes," over the next three years, the Clinic in fact tested for twenty-two classes of drugs in 99.77% of the urine drug tests it administered to Medicare patients and billed to Medicare.

61. In December 2015, the Clinic's lab manager wrote to Dr. Workman and Dr. Soloniuk explaining the Clinic's urine drug testing panel, noting that "filler" drugs had been added to the panel to reach the twenty-two drug classes required to bill for a G0483 code: "Classes 17-22 are fillers for the 22 requirement." He attached the Clinic's urine drug testing panel, on which he had made notations indicating that no patient had ever tested positive for several of the "fillers," but they were included to

meet the Clinic's goal of maximizing reimbursement: "Keep for 22 requirement – no positives."

62.     From January 2016 through 2018, the Clinic regularly tested for the filler drugs, even though both Dr. Soloniuk and Dr. Workman knew those tests had virtually no clinical value and should not have been eligible for Medicare reimbursement.

63.     For example, the Clinic routinely tested thousands of Medicare patients for Spice (JWH-018), a synthetic THC compound. According to Dr. Soloniuk and Dr. Workman's own published research, abuse of Spice was non-existent in their patient population, making tests for Spice medically unnecessary. Several of the Clinic's providers, who routinely ordered tests for Spice, could not identify Spice as it was reflected on the Clinic's own drug test order form, making it impossible for them to have determined it was medically necessary on an individualized basis.

64.     Another example of an unnecessary filler drug was phencyclidine, or "PCP." Its usage among the Medicare population is virtually non-existent and Dr. Soloniuk and Dr. Workman's own published research indicated that abuse of PCP was not present in the local patient population. Still, the Clinic ordered up to nineteen tests for PCP for Medicare patients every day, often routinely testing the same patient for PCP multiple times, even though no patient at the Clinic had ever tested positive for the drug.

65.     Of the definitive urine drug tests Defendants billed to Medicare, 99.77% included multiple filler drugs that had never been observed in the patient population, let alone simultaneously in a single patient.

66.     Dr. Soloniuk ensured the Clinic was consistently billing for "22 testing areas." For instance, in June 2017, the Clinic's office manager sent an email to Dr. Soloniuk detailing the codes being billed for urine drug tests. Consistent with the plan Defendants had agreed on in 2015, the only code listed was G0483, the code for tests including at least twenty-two drug classes.

**B.     Blanket Tests**

67.     From January 2016 through early 2018, Defendants consistently failed to perform the patient-specific assessment required by Medicare for the reimbursement of urine drug testing claims.

68.     Dr. Soloniuk admitted under oath that he did not individually decide which specific drugs to test for on the definitive tests that he ordered.

69.    In addition to personally ordering drug tests, Dr. Soloniuk and Dr. Workman utilized mid-level providers, called Physician Assistants, who practiced at the Clinic under their supervision and direction.

70.    The relationship between Dr. Soloniuk and Dr. Workman and the mid-level providers worked substantially as follows, with some modifications over time: The doctors provided the mid-level providers a treatment algorithm, which was essentially a decision tree, and then monitored the mid-level provider's activities to ensure that they adhered to that treatment algorithm. The treatment algorithm, as established by Dr. Soloniuk and Dr. Workman, would always dictate the same result for Medicare patients: that the mid-level providers would order both a screen test and a definitive test for twenty-two drug classes (code G0483), regardless of individualized assessment or need.

71.    One of the Clinic's Physician Assistants, who practiced under the supervision and direction of Dr. Soloniuk and Dr. Workman and executed their treatment algorithm for urine drug tests, admitted: "We have to test for the same substances for each individual."

72.    As a central component of the Clinic's treatment algorithm, the Clinic enabled, required, and enforced the use of prefilled drug test order forms (the "Blanket Order Forms"), which were designed to induce its providers to order tests at the highest reimbursement level, regardless of medical necessity. While the Clinic made minor variations to the Blanket Order Forms over time, their function remained the same.

73.    The Blanket Order Forms worked substantially as follows: when a screen test was indicated for a Medicare patient, the Clinic's providers were presented with a pre-filled form concurrently ordering both a screen test and a definitive test. The Blanket Order Form had a pre-filled line, often a line Xeroxed across all of the drugs, instructing the midlevel provider to order a test for all of the drug classes, regardless of the patient's unique circumstances. Once initialed by the mid-level provider, the Blanket Order Form was transmitted to the laboratory. When the urine sample arrived, the Clinic's laboratory would test for all of the twenty-two pre-filled drug classes. If the patient was a Medicare patient, the Clinic would bill Medicare for the screen test plus the highest-level definitive test using the G0483 code. Defendants' practice of requiring the use of pre-filled Blanket Order Forms removed the mid-level providers' independent medical judgment and required them to order the same

test for all the patients, regardless of the screen test results, the patient's presentation, or the relevant clinical history.

74. Another one of the Clinic's Physician Assistants, who also practiced under the supervision and direction of Dr. Soloniuk and Dr. Workman and executed their treatment algorithm for urine drug tests, admitted that they did not determine that testing for each of these drugs was medically appropriate before initialing the Blanket Order Forms.

75. One of the Clinic's external Medicare billing consultants, Medicare Billing Consultant A, described the use of Blanket Order Forms in an April 7, 2017 email: "G0483 is the code we bill. There is a line drawn through all of the drugs tested on the sheet we get to bill from. They are always the same."

76. The Blanket Order Forms had a section entitled "DEFINITIVE CONFIRMATION – G0483." G0483, the code for twenty-two drug classes, was not listed as an option; it was the only choice. The other codes, G0480 through G0482, were not listed on the form at all, even though they could have been appropriate in certain cases based on patients' individual circumstances.

77. Another third-party consultant wrote an email warning Dr. Soloniuk, Dr. Workman, and other Clinic staff that they should not use pre-filled, photocopied order forms because "this can lead to a physician photocopying [an order form] and using that for all orders, which would not be appropriate as the physician has to make an independent determination for each patient for each visit."

78. Dr. Soloniuk and Dr. Workman each admitted under oath that they knew the use of a pre-filled form was inappropriate.

79. The Clinic's Physician Assistants routinely ordered urine drug tests, which Defendants billed to Medicare, using the Blanket Order Form. But when questioned under oath, three of the Physician Assistants were not familiar with all the drugs on the form. Because they did not even know what those drugs were, it was impossible for them to have made the conclusion that testing for them was clinically appropriate based on patients' specific medical needs.

80. Because Defendants enabled, required, and enforced the use of their treatment algorithm and accompanying Blanket Order Forms, Defendants caused the submission of false claims for urine drug test reimbursements that did not meet Medicare's requirements and were not reasonable and necessary.

## C. Simultaneous Screen and Definitive Tests

81. In addition to routine testing for "filler" drugs and using pre-filled Blanket Order Forms, Defendants virtually always ordered the blanket definitive test for twenty-two drug classes without even reviewing the results from the initial screen test. This again led to drug testing for Medicare patients that was not reasonable and necessary.

82. Defendants knew that the November 2015 Local Coverage Determination required clinicians to consider the results of the screen test when determining whether to order a definitive test that would be billed to Medicare. For example, Dr. Workman explained to Dr. Soloniuk in a January 2018 email that the "[M]edicare LCD assumes that between screening and quant [definitive test] a clinical decision will be made[.]"

83. From at least 2015 until in or around February 2018, the Clinic used a sophisticated Siemens immunoassay analyzer to perform screen tests. Due to practical limitations, the Clinic required at least 24 hours to obtain results from the immunoassay analyzer.

84. In 2016, while still using the immunoassay analyzer to perform screen tests, Defendants ordered screen and definitive tests on the same day in all but one instance of the urine drug tests billed to Medicare during that year. Similarly, in 2017, Defendants ordered the tests on the same day in all but a handful of cases. This practice made it impossible for the Clinic's providers to have considered the screen test results when determining the necessity of the definitive test or to refine its scope.

85. The Clinic's routine practice of ordering tests for all twenty-two drugs before reviewing the screen test results demonstrates its intent to bill at the maximum level, irrespective of patients' medical needs.

86. Because the Defendants directed its providers to automatically confirm virtually every screen test with an unnecessary definitive test for the entire panel of twenty-two drugs, Defendants caused the submission of false claims for urine drug test reimbursements that did not meet Medicare's requirements and were not reasonable and necessary.

## D. Inadequate Documentation

87. At all times relevant to this Complaint, Defendants consistently failed to document any reason why testing for such a broad range of drugs was reasonable and necessary for each specific

patient's unique circumstances.

88.     Dr. Workman admitted under oath that he did not individually assess or adequately document the reason why testing for such a broad range of drugs was reasonable and necessary for each patient's unique circumstances.

89.     In an April 2017 email, Medicare Billing Consultant A explained to Dr. Soloniuk and the Clinic's staff that Noridian had denied its urine drug test Medicare claims and that Medicare had upheld those denials on appeal because "the documentation failed to support the medical justification for testing 22 or more drug classes." The Clinic's office manager later forwarded this warning to Dr. Workman.

90.     Despite that warning, Defendants did not ensure that the Clinic's Medicare claims were supported by documentation that would justify testing Medicare patients for such a broad range of drugs. For example, Defendants failed to document any individualized basis to suspect that 99.77% of the Clinic's Medicare patients had been simultaneously ingesting multiple drugs heretofore unseen in the patient population, like PCP and Spice. Absent substantiating documentation, Defendants knew they could not properly bill Medicare for these tests.

## VI. <u>DEFENDANTS KNOWINGLY SUBMITTED FALSE CLAIMS</u>

91.     At all times relevant to the Complaint, Defendants knew their claims were false. They have acknowledged under oath that they understood Medicare's requirements, were familiar with the 2015 LCD, and, as described above, received multiple warnings regarding those requirements. (*See, e.g.*, *supra* at ¶¶ 53, 79, 84, 91).

92.     The government also unequivocally informed Defendants during the course of their fraudulent scheme that Defendants' Medicare claims were improper. Defendants' misconduct persisted in the face of those various warnings, audits, and penalties.

93.     For example, in July 2017, Noridian selected the Clinic for a "targeted probe and education." During this process, Noridian audited 35 of the Clinic's urine drug tests claims for Medicare reimbursement. Noridian denied all 35 of the claims they reviewed. The Clinic did not appeal those denials.

94.     Following this audit, in November 2017, Noridian representatives delivered a presentation to the Clinic, which Dr. Workman and Dr. Soloniuk attended, reiterating Medicare's

requirements for urine drug tests. Noridian again informed Defendants that none of the Clinic's audited urine drug test claims included documentation to explain why it was medically necessary to test each of the patients for twenty-two drug classes. Noridian also told Defendants to stop doing blanket tests, *i.e.*, testing virtually all their patients for exactly the same combination of drugs, regardless of individualized need.

95.     In December 2017, Medicare Billing Consultant A again explained Noridian's position to the Clinic's staff, including Dr. Workman and Dr. Soloniuk, in clear terms. She told them they needed to stop "blanket testing" and "billing the highest definitive code ALWAYS[.]"

96.     Despite these clear directives, Defendants persisted in ordering blanket tests and submitting claims using the highest definitive code for all urine drug tests billed to Medicare.

97.     Indeed, Defendants' use of the highest code increased. In 2018, directly following these explicit warnings from Defendants' Medicare Administrative Contractor and their own consultant, the Clinic's laboratory billed 100% of its definitive tests using the G0483 code.

98.     In response to clear instructions from Noridian, rather than change their practices to begin performing individualized assessments and billing the tests appropriately, Defendants continued to order blanket tests under an almost identical algorithm, using similar pre-filled blanket test order forms. As explained by one of the Clinic's Physician Assistants during sworn testimony, the Clinic continued to test everyone for all twenty-two drug classes no matter what:

> Q.  Okay.  And so using that algorithm that you
> described, is there a situation where the [screen]
> test could be negative and the testing would cease?
> A.  No.
> Q.  And using this form, there's not a way, if the
> [screen] test was positive, to focus the definitive
> test on a specific category of drugs?
> A.  Correct.
> Q.  So in other words, you weren't using the
> [screen] test to narrow where in the hay stack to

look for the needle; right?

A. Correct.

Q. And you just tested for all the things,

regardless of the [screen] test; correct?

A. Correct.

99.     Despite being warned, penalized, and offered a detailed educational presentation, Defendants continued ordering blanket definitive tests for every single Medicare patient.

## VII. DEFENDANTS' FALSE CLAIMS WERE MATERIAL

100.     Defendants' false statements to Medicare were material to the United States' decision to pay Defendants' claims.

101.     Defendants falsely claimed they were entitled to reimbursement for testing for drugs that were not medically necessary. Because applicable Medicare regulations do not permit reimbursement for clinical services, including urine drug testing, that are not medically necessary, the United States was barred from paying those claims, and it would not have paid them.

102.     Providing accurate billing codes on Medicare claims is material to and a condition of payment for the Medicare Program. Defendants falsely claimed they were entitled to reimbursement under the G0483 code when they did not meet the applicable requirements. Had the United States known the truth, it would not have paid such claims.

103.     Defendants knew that CMS considered blanket testing to be a non-covered service and that Medicare would have continued to deny claims for such tests if it had been aware of the Clinic's blanket testing policies.

104.     As referenced in paragraph 89, above, Defendants knew that Noridian denied all their claims for urine drug tests that it had reviewed and that when Defendants appealed those determinations, Medicare upheld those denials because their "documentation failed to support the medical justification for testing 22 or more drug classes."

105.     As referenced paragraph 93, above, Defendants knew that Noridian selected the Clinic for a "targeted probe and education," and as part of that process, it audited and denied 100% of the Clinic's urine drug test claims because, among other things, the Clinic had engaged in blanket testing.

## VIII. DEFENDANTS' FRAUDULENT CONDUCT CAUSED DAMAGE TO THE MEDICARE PROGRAM

106. As a result of Defendants' conduct, the United States paid for thousands of false and fraudulent claims for non-covered tests that Defendants knowingly submitted in violation of Medicare's requirements.

107. As a result of Defendants' scheme, the Clinic billed Medicare for G0483, the highest-level reimbursement code for urine drug testing, in 99.779% of the claims it submitted to Medicare during the time period in question:

| Code | 2016 | 2017 | 2018 | Totals | Percentage |
|------|------|------|------|--------|------------|
| G0480 | 1 | 8 | 0 | 9 | 0.22% |
| G0481 | 0 | 0 | 0 | 0 | 0 |
| G0482 | 0 | 0 | 0 | 0 | 0 |
| G0483 | 1986 | 1951 | 141 | 4078 | 99.779% |

108. That Defendants never ordered urine drug tests for between eight and twenty-one drugs, and only tested for between zero and eight drugs nine times in three years, further confirms that Defendants could not have been tailoring the definitive test to the patients' individualized medical needs as required by Medicare.

109. The United States incurred damages arising from Defendants' submission of claims to Medicare for urine drug tests that were not reasonable and necessary and for which the need was not assessed or documented for individual patients.

## IX. PARTICULAR EXAMPLES OF FRAUDULENT CLAIMS

110. Described below, and reflected in the corresponding attached exhibits, are examples of specific instances in which Defendants submitted false claims to Medicare for urine drug tests.

111. In these and thousands of other instances, Defendants' claims were knowingly and materially false and damaged the United States.

### A. Dr. Soloniuk

112. Dr. Soloniuk treated "C.O.," one of the Clinic's Medicare patients, for chronic spine pain.

113. Dr. Soloniuk signed the medical record for C.O.'s appointment on April 5, 2017. That medical record reflects that CO had no history of illicit substance use and does not suggest that anything in C.O.'s presentation indicated illicit substance use.

114. Dr. Soloniuk knowingly caused the Clinic to submit a false claim for a urine drug test administered to C.O. during that April 5, 2017 encounter, as follows:

a)      Under Dr. Soloniuk's supervision and control, the Physician Assistant executed the Clinic's treatment algorithm and initialed a Blanket Order Form, which had a pre-filled, Xeroxed line indicating a request for definitive urine drug testing across all twenty-two drug classes, including PCP and Spice, which the Clinic had designated as "filler" drugs and for which Dr. Soloniuk knew that no patient had ever tested positive.

b)      Under Dr. Soloniuk's supervision and control, the Physician Assistant ordered the screen test and the definitive test on the same day. Because the Clinic was still using its immunoassay analyzer to conduct screen tests during April 2017, it would have been impossible for them to have considered the screen test results in deciding whether to order the definitive test or to narrow its scope.

c)      Consistent with Defendants' agreement, the Clinic submitted claims to Medicare seeking reimbursement for C.O.'s definitive test using code G0483, the maximum possible reimbursement level, as further detailed in Exhibit 1.

115. Despite being the supervising provider for C.O.'s April 5, 2017 visit to the Clinic, Dr. Soloniuk did not individually assess or document any reason why testing for such a broad range of drugs was reasonable and necessary for C.O.'s unique circumstances.

116. Dr. Soloniuk, fully aware of the requirements of the Medicare program and the LCD, knew claims for these unnecessary, non-covered tests were false and that the falsity was material to Medicare's decision to pay these claims.

117. Based on Dr. Soloniuk and the Clinic's knowing submission of these materially false claims for payment to the government, the Clinic collected $248.79 to which it was not entitled for this drug test.

**B.      Dr. Workman**

118. Dr. Workman treated "J.K.," one of the Clinic's Medicare patients, for pain medication management.

119. Dr. Workman signed the medical record for J.K.'s appointment on February 23, 2017.

That medical record does not reflect that Dr. Workman suspected J.K. of illicit substance use, and instead states that Dr. Workman reviewed JK's "consistent [prescription history] and [urine drug tests,]" meaning that Dr. Workman determined that J.K. had adhered to his treatment plan.

120. Dr. Workman knowingly caused the Clinic to submit a false claim for a urine drug test administered to J.K. during that February 23, 2017 encounter, as follows:

a) Under Dr. Workman's supervision and control, the Physician Assistant executed the Clinic's treatment algorithm and initialed a Blanket Order Form, which had a pre-filled, Xeroxed line indicating a request for definitive urine drug testing across all twenty-two drug classes, including PCP and Spice, which the Clinic had designated as "filler" drugs and for which Dr. Workman knew that no patient had ever tested positive.

b) Under Dr. Workman's supervision and control, the Physician Assistant ordered the screen test and the definitive test on the same day. This made it impossible for them to have considered the screen test results in deciding whether to order the definitive test or to narrow its scope.

c) Consistent with Defendants' agreement, the Clinic submitted claims to Medicare seeking reimbursement for J.K.'s definitive test using code G0483, the maximum possible reimbursement level, as further detailed in Exhibit 2.

121. Despite being the supervising provider for J.K.'s February 23, 2017 visit to the Clinic, Dr. Workman did not individually assess or document any reason why testing for such a broad range of drugs was reasonable and necessary for J.K.'s unique circumstances.

122. Dr. Workman, well aware of the requirements of the Medicare program and the LCD, knew claims for these unnecessary, non-covered tests were false and that the falsity was material to Medicare's decision to pay these claims.

123. Based on Dr. Workman and the Clinic's knowing submission of these materially false claims for payment to the government, the Clinic collected $248.79 to which it was not entitled for this urine drug test.

C. **Routine Submission of False Claims**

124. These fraudulent claims were not accidents or isolated incidents, but the inevitable result

of Defendants' regular practices and procedures, which were calibrated to accomplish their plan to bill virtually all urine drug tests administered to Medicare patients at the maximum reimbursement level, regardless of individualized need or assessment. This is exemplified by the claims submitted to Medicare for urine drug testing on certain particular days on which, as on many other days during the time period alleged herein, Defendants consistently ordered unreasonable and medically unnecessary urine drug tests without considering or documenting any individualized assessment of their patients' medical needs.

### 1.    Thirteen Patients on March 22, 2017

125.    As shown in Exhibit 3, on March 22, 2017, the Clinic ordered urine drug tests for thirteen Medicare patients.  For each and every Medicare patient that day:

a)    The Clinic's provider used the Blanket Order Form, which had a pre-filled, Xeroxed line to indicate definitive testing for all twenty-two drug classes, including PCP and Spice, which the Clinic had designated as "filler" drugs and for which Dr. Workman and Dr. Soloniuk knew that no patient had ever tested positive.

b)    The Clinic's provider ordered the screen test and the definitive test on the same day, meaning that it was impossible for them to have considered the screen test results in deciding whether to order the definitive test or to narrow the scope of the definitive test.

c)    The Clinic's provider did not individually assess or adequately document the reason why testing for such a broad range of drugs was reasonable and necessary for each of these specific patient's unique circumstances.

126.    Consistent with Defendants' agreement, the Clinic submitted claims to Medicare seeking reimbursement for each of the definitive tests performed on March 22, 2017 using code G0483, the maximum possible reimbursement level.

127.    Defendants, well aware of the requirements of the Medicare program and the relevant Local Coverage Determination, knew claims for these unnecessary, non-covered tests were false and that the falsity was material to Medicare's decision to pay these claims.

128.    Based on its knowing submission of materially false claims for payment to the United States, the Clinic collected $2,757.25 to which it was not entitled for these thirteen tests.

## 2. Nineteen Patients on April 3, 2017

129. As shown in Exhibit 4, on April 3, 2017, the Clinic ordered urine drug tests for nineteen Medicare patients. For each and every Medicare patient that day:

a) The Clinic's provider used the Blanket Order Form, which had a pre-filled, Xeroxed line to indicate definitive testing for all twenty-two drug classes, including PCP and Spice, which the Clinic had designated as "filler" drugs and for which Dr. Workman and Dr. Soloniuk knew that no patient had ever tested positive.

b) The Clinic's provider ordered the screen test and the definitive test on the same day, meaning that it was impossible for them to have considered the screen test results in deciding whether to order the definitive test or to narrow the scope of the definitive test.

c) The Clinic's provider did not individually assess or adequately document the reason why testing for such a broad range of drugs was reasonable and necessary for each of these specific patient's unique circumstances.

130. Consistent with Defendants' agreement, the Clinic submitted claims to Medicare seeking reimbursement for each of the definitive tests performed on April 3, 2017 using code G0483, the maximum possible reimbursement level.

131. Defendants, well aware of the requirements of the Medicare program and the LCD, knew claims for these unnecessary, non-covered tests were false and that the falsity was material to Medicare's decision to pay these claims.

132. Based on its knowing submission of materially false claims for payment to the government, the Clinic collected $4,315.79 to which it was not entitled for these nineteen tests.

## 3. Fourteen Patients on July 12, 2017

133. As shown in Exhibit 5, on July 12, 2017, the Clinic ordered urine drug tests for fourteen Medicare patients, and in every single case:

a) The Clinic's provider used the Blanket Order Form, which had a pre-filled, Xeroxed line to indicate definitive testing for all twenty-two drug classes, including PCP and Spice, which the Clinic had designated as "filler" drugs and for which Dr. Workman and Dr. Soloniuk knew that no patient had ever tested positive for.

b) The Clinic's provider ordered the screen test and the definitive test on the same day, meaning that it was impossible for them to have considered the screen test results in deciding whether to order the definitive test or to narrow the scope of the definitive test.

c) The Clinic's provider did not individually assess or adequately document the reason why testing for such a broad range of drugs was reasonable and necessary for each of these specific patient's unique circumstances.

134. Consistent with Defendants' agreement, the Clinic submitted claims to Medicare seeking reimbursement for each of the definitive tests performed on July 12, 2017 using code G0483, the maximum possible reimbursement level.

135. The Clinic, well aware of the requirements of the Medicare program and the LCD, knew claims for these unnecessary, non-covered tests were false and that the falsity was material to Medicare's decision to pay these claims.

136. Based on its knowing submission of materially false claims for payment to the government, the Clinic collected $2,985.48 to which it was not entitled for these fourteen tests.

## X. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**False Claims Act: Presenting or Causing to be Presented False Claims**

137. The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 136, above, as if fully set forth herein.

138. Defendants each violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting or causing to be presented, false or fraudulent claims for payment or approval to CMS for excessive and medically unnecessary urine drug tests, in violation of the Medicare program's regulations and policies, which Defendants agreed to and were obligated to comply with. Defendants' false claims were material to Medicare's payment decisions, and their violations of 31 U.S.C. § 3729(a)(1)(A) resulted in their receiving Medicare payments from CMS to which they were not entitled.

139. By reason of the false claims that Defendants knowingly presented or caused to be presented, the United States has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## SECOND CLAIM FOR RELIEF
### False Claims Act: Making or Using False Records or Statements

140.    The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 136, above, as if fully set forth herein.

141.    Defendants each violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, and causing to be made or used, false records or statements material to false or fraudulent claims resulting in their receiving Medicare payments from CMS to which they were not entitled.  Those false records or statements were material to Medicare's payment decisions.

142.    By reason of the false records and statements that Defendants knowingly made, used, and caused to made or used, the United States has incurred damages in a substantial amount to be determined at trial and is entitled to treble damages plus a civil penalty for each such violation.

## THIRD CLAIM FOR RELIEF
### Payment by Mistake

143.    The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 136, above, as if fully set forth herein.

144.    As a consequence of Defendants' misconduct and the acts set forth above, Defendants received monies from the United States in the form of Medicare reimbursement for urine drug testing as a result of the United States' mistaken understanding that such claims were compliant with Medicare regulations, were reasonable and medically necessary, and based on individualized assessments that had been adequately documented.  In fact, none of those were true.

145.    Had the United States known the truth, it would not have paid such claims and/or would have taken other appropriate actions to ensure that Defendants did not receive or retain the payments to which they were not entitled.

146.    As a result of such mistaken payments, the United States has sustained damages for which Defendants are liable in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment

147.    The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 136, above, as if fully set forth herein.

148.     As a consequence of Defendants' conduct and the acts set forth above, Defendants were unjustly enriched at the expense of the United States. In equity and good conscience such money belongs to the United States.

149.     The United States is entitled to recover such money based on Defendants' unjust enrichment in an amount to be determined at trial.

## XI. PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests that judgment be entered in its favor and against Defendants as follows:

A.  On Claims I and II, against all Defendants jointly and severally, for: (i) the amount of the United States' damages, trebled as required by law; (ii) the maximum civil penalties allowed by law, (iii) the costs of this action, plus interest as provided by law, and (iv) any other relief that this Court deems appropriate.

B.  As to Claim III (Payment by Mistake), for: (i) an amount equal to the money paid by the United States through the Medicare program as a result of Defendants' false submissions, plus interest; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate.

C.  As to Claim IV (Unjust Enrichment), for: (i) an amount equal to the amount Defendants were unjustly enriched, plus interest; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate.

## XII. DEMAND FOR JURY

The United States demands a trial by jury.

Dated:  December 1, 2023

PHILLIP A. TALBERT
United States Attorney


By:  _/s/ Steven S. Tennyson_
STEVEN TENNYSON
Assistant United States Attorney