UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. EDWARD POLLARD,<br><br>Plaintiff,<br><br>v.<br><br>SOLONIUK CLINIC, et al.,<br><br>Defendants. | No. 2:19-cv-00325-DC-SCR<br><br>ORDER DENYING MOTIONS TO DISMISS<br><br>(Doc. Nos. 58, 59, 60, 61, 77-1, 79) |

This matter is before the court on the motion to dismiss filed by Defendants Theodore E. Workman, Jr., and Soloniuk Pain Clinic (Doc. No. 58) and the motion to dismiss filed by Defendant Leonard J. Soloniuk (Doc. No. 60). Pursuant to Local Rule 230(g), the pending motions were taken under submission to be decided on the papers. (Doc. No. 63.) For the reasons explained below, the court will deny both motions to dismiss.

**BACKGROUND**

This is a *qui tam* action originally brought by Relator Edward Pollard on behalf of the United States of America and the State of California under the False Claims Act ("FCA") 31 U.S.C. § 3730, in a complaint filed on February 22, 2019, in which Relator alleges his employer submitted false and fraudulent claims to the government for reimbursement payments for urine drug tests of Medicare patients. (Doc. No. 1.) Relator asserts the following false claims act and retaliation causes of action in his complaint: (1) violation of 31 U.S.C. § 3729(a)(1)(A); (2)

violation of 31 U.S.C. § 3729(a)(1)(B); (3) violation of 31 U.S.C. § 3729(a)(1)(C); (4) violation of 31 U.S.C. § 3729(a)(1)(G); (5) violation of California False Claims Act, California Government Code § 12651(a)(1)–(2); (6) violation of California Government Code § 12651(a)(3); (7) violation of California Government Code § 12651(a)(7); (8) violation of California Government Code § 12651(a)(8); (9) wrongful termination in violation of public policy against Defendant Soloniuk; (10) retaliation in violation of California Labor Code §§ 98.6, 1102.5(b) against Defendant Soloniuk; (11) retaliation in violation of 31 U.S.C. § 3730(h) against Defendant Soloniuk; (12) retaliation in violation of California Government Code § 12653 against Defendant Soloniuk; and (13) violation of California's Unfair Competition Law ("UCL") against Defendant Soloniuk. (*Id.*) However, Relator voluntarily dismissed his third through eighth causes of action. (Doc. Nos. 46, 51.)

After receiving several extensions of time in which to decide whether to intervene in this action, on November 3, 2023, Intervenor Plaintiff United States filed its notice of intervention, specifically intervening only as to Relator's first and second causes of action, but not Relator's wrongful termination and relation claims.[1] (Doc. No. 31.)

On December 1, 2023, Interventor Plaintiff United States filed its complaint in intervention ("CII"), bringing the following four claims: (1) violation of 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting or causing to be presented, false or fraudulent claims for payment or approval to Medicare; (2) violation of 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, and causing to be made or used, false records or statements material to false or fraudulent claims resulting in their receiving Medicare payments to which they were not entitled; (3) payment by mistake; and (4) unjust enrichment. (Doc. No. 39.)

In the CII, Intervenor Plaintiff alleges as follows.

Defendants Soloniuk and Workman are medical doctors who jointly owned Defendant Soloniuk Pain Clinic ("Defendant Clinic"), a clinic located in Redding, California that specialized in treating chronic pain and often ordered urine drug tests. (*Id.* at ¶ 1.) Urine drug tests are used to

---

[1] The State of California filed a notice of its election to decline intervention on January 3, 2024, and was thereafter terminated from this action. (Doc. No. 43.)

identify the presence or absence of drugs in a patient's body. (*Id.* at ¶ 34.) Under the prevailing standard of care, clinicians generally first order a "screen" test, which is quick and inexpensive, like drug test cups with built-in test strips, to detect the presence of drugs. (*Id.* at ¶¶ 34–36, 37.) Then, depending on the results of the screen test, clinicians may order "definitive" drug testing, which is more expensive and uses advanced techniques to yield precise results identifying the concentration of a drug in the patient's urine sample. (*Id.* at ¶¶ 38–39.) The clinical value of definitive testing depends on each patient's unique medical condition, clinical history, and presentation, as assessed and documented by the medical provider. (*Id.* at ¶ 40.) A definitive test may be reasonable and necessary to confirm unexpected results from the screen test, such as confirming the apparent absence of a prescription medication that the patient insists they are taking as prescribed, or confirming an unexpected positive screen test result for an illicit drug. (*Id.* at ¶¶ 34, 41–42.)

Defendants Soloniuk and Workman knew that if they wanted to receive reimbursements from Medicare for the urine drug tests they administered, they had to comply with Medicare regulations, which required diagnostic tests to be based on the individualized need of the patient. (*Id.* at ¶ 2.) Medicare only covers services that are reasonable and necessary for the diagnosis or treatment of an illness, and in order to assess whether reimbursement is permitted, Medicare requires the physician ordering the diagnostic tests to provide proper and complete documentation of the services rendered to Medicare beneficiaries. (*Id.* at ¶¶ 29–33.) Medicare regulations make clear that claims for reimbursement will be denied for laboratory tests, like urine drug tests, that are not individualized to patient need (or for which the need is not documented in the patient chart). (*Id.* at ¶ 27.) "Medicare regulations expressly state that a laboratory's claim for a service will be denied if there is no sufficient documentation in the patient's medical record to establish that the service was reasonable and necessary." (*Id.* at ¶ 33) (citing 42 C.F.R. § 410.32(d)(3)).

To obtain Medicare reimbursement for services, like urine drug testing, medical providers typically submit an electronic claim to private companies with whom Medicare contracts to act as Medicare's agents in reviewing and paying claims. (Doc. No. 39 at ¶¶ 23, 25.) During all times relevant to this case, Noridian Healthcare Solutions, LLC ("Noridian") served as Medicare's

agent and was responsible for processing all of the claims submitted by Defendants to Medicare. (*Id.* at ¶ 23.)

On the electronic claim forms, the medical provider includes Medicare codes that identify the services rendered and for which reimbursement is sought. (*Id.* at ¶ 25.) In December 2015, Defendant Soloniuk discovered that Medicare had announced some changes to the reimbursement rates for urine drug testing for the upcoming year, specifically that a screen test would be reimbursed at a rate of $80.00, and the reimbursement rate for definitive tests would be based on the number of drugs tests, providing four categories: (i) Code G0480 for 1–7 drugs tested; (ii) Code G0481 for 8–14 drugs tested; (iii) Code G0482 for 15–21 drugs tested; and (iv) Code G0483 for 22 or more drugs tested. (*Id.* at ¶ 57.) The last category, for testing 22 or more drugs, would be reimbursed at the highest rate of $215.08. (*Id.*) In an email sent to his staff in December 2015, Dr. Soloniuk instructed the staff of Defendant Clinic that "[w]e need to do the 22 testing areas," reasoning that they could be reimbursed $80 for each screen test and $215.08 for each definitive test if at least 22 drugs are tested under Code G0483, such that their "collections per Medicare [patient] would be 215.08 + 80 = 295.08." (*Id.* at ¶ 58.) In response to that email, Defendant Clinic's lab manager stated: "I agree to test for only 22 classes." (*Id.* at ¶ 59.)

Intervenor Plaintiff alleges that neither Defendant Workman nor Defendant Soloniuk "gave any advisement that staff should only order testing as was reasonable and medically necessary for a specific patient," and "[i]nstead, every Medicare patient would receive the combination of tests that resulted in the maximum reimbursement." (*Id.* at ¶ 58.) Over the next three years, 2016–2018, Defendant Clinic "in fact tested for twenty-two classes of drugs in 99.77% of the urine drug tests it administered to Medicare patients and billed to Medicare." (*Id.* at ¶ 60.) To reach that maximum reimbursement amount, Defendants added unnecessary drugs they called "fillers" to their testing panel, such as "Spice" (a synthetic THC compound) and PCP (phencyclidine), and they tested "virtually every Medicare patient for the same combination of 'fillers,'" despite knowing that "the unnecessary filler drugs were non-existent in the patient population." (*Id.* at ¶¶ 54–55, 62–64.) In doing so, Defendants also "consistently failed to perform the patient-specific assessment required by Medicare for the reimbursement of urine drug testing

claims." (*Id.* at ¶ 67.) "Dr. Soloniuk admitted under oath that he did not individually decide which specific drugs to test for on the definitive tests that he ordered." (*Id.* at ¶ 68.) Defendants also hired mid-level providers, called Physician Assistants, who practiced at Defendant Clinic under their supervision and direction and likewise adhered to the treatment algorithm established by Defendants. (*Id.* at ¶¶ 69–70.) That is, "the mid-level providers would order both a screen test and a definitive test for twenty-two drug classes (code G0483), regardless of individualized assessment or need." (*Id.* at ¶ 70.) One of the Physician Assistants admitted: "We have to test for the same substances for each individual." (*Id.* at ¶ 71.) To ensure compliance with this algorithm, Defendants utilized pre-filled forms to order urine drug tests through which the provider would concurrently order a screen test and a definitive test based on a line Xeroxed across the form, pre-selecting the same 22 drug classes ("Blanket Order Forms"). (*Id.* at ¶¶ 72–76.) One of Defendant Clinic's external Medicare billing consultants "described the use of Blanket Order Forms in an April 7, 2017 email: 'G0483 is the code we bill. There is a line drawn through all of the drugs tested on the sheet we get to bill from. They are always the same.'" (*Id.* at ¶ 75.) On the Blanket Order Form, "G0483, the code for twenty-two drug classes, was not listed as an option; it was the only choice"—none of the other Medicare codes were listed on the form. (*Id.* at ¶ 76.)

In a Local Coverage Determination ("LCD") issued by Noridian in November 2015, Noridian expressly stated that Medicare will only reimburse for tests that are based on patient specific assessments—"Blanket Orders" will not be reimbursed, and "[r]outine standing orders for all patients in a physician's practice are not reasonable and necessary." (*Id.* at ¶ 47–48.) Defendants Soloniuk and Workman "each admitted under oath that they knew the use of a prefilled form was inappropriate." (*Id.* at ¶ 78.) Defendants also knew that the LCD required clinicians to consider the results of the screen test when determining whether to order a definitive test that would be billed to Medicare, as shown in an email from Defendant Workman to Defendant Soloniuk in January 2018 stating that the "[M]edicare LCD assumes that between screening and [definitive test] a clinical decision will be made." (*Id.* at ¶ 82.) However, due to practical limitations of the immunoassay analyzer Defendant Clinic used to perform screen tests, screen tests results were not available for at least 24 hours, meaning that definitive tests ordered

the same day as screen tests did not account for screen test results. (*Id.* at ¶ 83–84.) Defendants' intent to bill at the maximum level is reflected by their routine practice of ordering definitive tests for 22 classes of drugs before reviewing any screen test results. (*Id.* at ¶ 85.)

Intervenor Plaintiff further alleges that "Defendants consistently failed to document any reason why testing for such a broad range of drugs was reasonable and necessary for each specific patient's unique circumstances." (*Id.* at ¶ 87.) Defendant Workman "admitted under oath that he did not individually assess or adequately document the reason" for ordering definitive testing of 22 classes of drugs for each urine drug test administered to Medicare patients. (*Id.* at ¶ 88.)

In sum, according to Intervenor Plaintiff, "Defendants caused the submission of false claims for urine drug test reimbursements that did not meet Medicare's requirements and were not reasonable and necessary" because they "enabled, required, and enforced the use of their treatment algorithm and accompanying Blanket Order Forms," and they "directed [their] providers to automatically confirm virtually every screen test with an unnecessary definitive test for the entire panel of twenty-two drugs." (*Id.* at ¶¶ 80, 86.) Further, because Defendants lacked substantiating documentation in the medical records to justify administering those tests, Defendants knew they could not properly bill Medicare for those tests. (*Id.* at ¶ 90.)

Intervenor Plaintiff alleges Defendants also knew their Medicare claims were improper because they received multiple warnings yet persisted with their fraudulent conduct. (*Id.* at ¶¶ 91–92.) Noridian audited 35 of Defendant Clinic's urine drug test claims for Medicare reimbursement as part of a "targeted probe and education" in July 2017, and Noridian denied all 35 of the claims they reviewed. (*Id.* at ¶ 93.) Later that year, Noridian representatives delivered a presentation to Defendants reiterating Medicare's requirements for urine drug tests and informing Defendants that none of their audited urine drug test claims included documentation to explain why it was medically necessary to test each of the patients for twenty-two drug classes. (*Id.* at ¶ 93.) "Noridian also told Defendants to stop doing blanket tests, i.e., testing virtually all their patients for exactly the same combination of drugs, regardless of individualized need." (*Id.* at ¶ 94.) In December 2017, Defendant Clinic's external Medicare billing consultant told Defendants "they needed to stop 'blanket testing' and 'billing the highest definitive code ALWAYS.'" (*Id.* at

¶ 95.) Despite these explicit warnings, in 2018, Defendants' use of the highest reimbursement code increased such that the Defendant Clinic's laboratory billed 100% of its definitive tests using the G0483 code. (*Id.* at ¶ 97.)

In the CII, Intervenor Plaintiff also describes examples of allegedly fraudulent claims, two patient examples and three specific date examples reflecting routine submission of false claims for Medicare reimbursement. (*Id.* at ¶¶ 110–136.) The court will not summarize those specific examples in this factual background, but those allegations have been considered in ruling on the pending motions and will be addressed as necessary in the analysis below.

In his complaint, Relator alleges he was hired by Defendant Soloniuk on April 11, 2016, to be the general supervisor of Defendant Clinic's laboratory, and he served in that position until his employment was terminated on February 20, 2018. (Doc. No. 1 at ¶¶ 51, 70.) Relator's complaint includes detailed allegations pertaining to his reporting of his concerns about Defendants' testing and Medicare billing practices, as well as other unsafe work conditions, and Relator alleges he was wrongfully terminated and retaliated against due to that reporting. (*Id.* at ¶¶ 51–70.)

As noted above, Relator filed his complaint initiating this lawsuit on February 22, 2019, though Intervenor Plaintiff did not file the CII until December 1, 2023. (Doc. Nos. 1, 39.) After receiving extensions of time in which to respond to the CII, Defendants filed the pending motions to dismiss on March 4, 2024. (Doc. No. 58, 60.)

Defendant Workman and Defendant Clinic seek dismissal of all claims brought in the CII pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that Intervenor Plaintiff fails to state cognizable claims. (Doc. No. 58 at 2.) Defendant Workman and Defendant Clinic also seek to dismiss the two FCA claims that Relator brought against them in his complaint on the ground that they fail for the same reasons that those claims in the CII fail. (*Id.*) In support of their motion, Defendant Workman and Defendant Clinic also filed a request for judicial notice, requesting the court take judicial notice of the public availability of Medicare billing data on certain internet websites and of eleven exhibits attached to their motion to dismiss. (Doc. No. 59.)

Defendant Soloniuk likewise seeks dismissal of all claims brought in the CII on the

ground that Intervenor Plaintiff fails to state cognizable claims, and he seeks dismissal of Relator's claims one and two brought under the FCA in Relator's complaint on the same grounds.[2] (Doc. No. 60.) In support of his motion, Defendant Soloniuk filed a similar request for judicial notice, requesting the court take judicial notice of the same public availability of Medicare billing data on certain internet websites and many of the same exhibits for which Defendant Workman and Defendant Clinic request judicial notice. (Doc. No. 61.)

On April 1, 2024, Intervenor Plaintiff filed oppositions to the pending motions to dismiss and the concurrently filed requests for judicial notice. (Doc. Nos. 70–73.) That same day, Relator filed a notice of his joinder in Intervenor Plaintiff's oppositions to Defendants' motions to dismiss. (Doc. No. 74.)

On April 11, 2024, Defendants filed their respective replies in support of their motions and additional requests for judicial notice of documents filed in support of those replies. (Doc. Nos. 77, 77-1, 78, 79.) Intervenor Plaintiff filed oppositions to those requests for judicial notice as well. (Doc. No. 80, 81.)

On October 11, 2024, Intervenor Plaintiff filed a notice of supplemental authority alerting the court to a relevant decision issued by the United States District Court for the Western District of Oklahoma, *United States ex rel. Johnson v. Kelly*, No. 20-cv-00018-JD, 2024 WL 1862183, at (W.D. Okla. Apr. 29, 2024), after the pending motions to dismiss in this case were fully briefed. (Doc. No. 88.)

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss a plaintiff's complaint for failure to state a claim upon which relief can be granted. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A claim may be dismissed for lack of a cognizable legal theory or the absence of sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990) (citing *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533–34 (9th Cir. 1984)).

[2] Defendant Soloniuk does not seek to dismiss Relator's employment and retaliation claims.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 8(a)(2) (a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief). A complaint satisfies the plausibility requirement if it contains sufficient facts for the court to "draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "[A] plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

For purposes of a motion to dismiss, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). "As a general rule, [courts] 'may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.'" *United States v. Corinthian Colleges*, 655 F.3d 984, 998 (9th Cir. 2011) (citation omitted). "There are two exceptions to this rule: the incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201." *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 998 (9th Cir. 2018). Thus, the court may consider materials outside the complaint if those materials are attached to the complaint, incorporated by reference in the complaint, or are matters of which judicial notice is taken. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim."); *Corinthian Colleges*, 655 F.3d at 999 (explaining that courts may take judicial notice of matters of public record, but courts "may not, on the basis of evidence outside of the Complaint, take judicial notice of facts favorable to Defendants that could reasonably be disputed").

If a court dismisses certain claims, "[l]eave to amend should be granted unless the district court 'determines that the pleading could not possibly be cured by the allegation of other facts.'" *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009) (quoting *Lopez v. Smith*,

203 F.3d 1122, 1127 (9th Cir. 2000) (en banc)).

## ANALYSIS

The court will first address Defendants' requests for judicial notice and then turn to the parties' arguments regarding whether Intervenor Plaintiff sufficiently states each of the claims brought in the CII.

### A. Judicial Notice and Incorporation by Reference

As an initial matter, although Defendants have framed their requests as seeking judicial notice, they rely on the incorporation by reference doctrine for several of the documents they request the court consider in ruling on their motions. Thus, the court discusses the standards applicable under both procedures.

1. Legal Standards

Judicial notice and incorporation by reference are both procedures by which district courts can "consider materials outside a complaint, but each does so for different reasons and in different ways." *Khoja*, 899 F.3d at 998.

Pursuant to Federal Rule of Evidence 201(b), a court may "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). However, "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Khoja*, 899 F.3d at 999 (9th Cir. 2018). The Ninth Circuit clarified by way of example that "[i]t is improper to judicially notice a transcript when the substance of the transcript 'is subject to varying interpretations, and there is a reasonable dispute as to what the [transcript] establishes.'" *Id.* at 999–1000 (quoting *Reina-Rodriguez v. United States*, 655 F.3d 1182, 1193 (9th Cir. 2011)).

Documents that constitute "matters of public record" may be judicially noticed. *Intri-Plex Techsn., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007); *see Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) (holding that judicial notice is appropriate for

"*undisputed* matters of public record" but not for "*disputed* facts stated in public records").

"[I]f a court takes judicial notice of a document, it must specify what facts it judicially notices from the document." *Sunga v. Naver Corp*., No. 21-cv-05143-HSG, 2026 WL 1102870, at *3 (N.D. Cal. Apr. 23, 2026) (citing *Khoja*, 899 F.3d at 999).

"The doctrine of incorporation by reference is distinct from judicial notice." *Al -Ahmed v. Twitter, Inc.*, 603 F. Supp. 3d 857, 866 (N.D. Cal. 2022). "Unlike rule-established judicial notice, incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Khoja*, 899 F.3d at 1002. "If the documents are not physically attached to the complaint, they may be considered if the documents' 'authenticity . . . is not contested' and 'the plaintiff's complaint necessarily relies' on them." *Lee*, 250 F.3d at 668 (citation omitted). "But the mere mention of the existence of a document is insufficient to incorporate the contents of a document." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (citing *Ritchie*, 342 F.3d at 908–09). Thus, a document "may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Ritchie*, 342 F.3d at 908. The purpose of the incorporation by reference doctrine is to "prevent[] plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja*, 899 F.3d at 1002.

In short, "[u]nder the incorporation-by-reference doctrine, a court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Sunga v. Naver Corp*., No. 21-cv-05143-HSG, 2026 WL 1102870, at *3 (N.D. Cal. Apr. 23, 2026) (citing *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006)). A district court's decision of whether to incorporate a document by reference is a matter of discretion. *See Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1159 (9th Cir. 2012) ("[T]he district court may, but is not required to incorporate documents by reference.").

/////

/////

2. Defendants' Requests Filed Concurrently with Motions to Dismiss[3]

Intervenor Plaintiff does not oppose Defendants' requests for the court to consider certain documents as those are properly the subject of judicial notice and/or properly incorporated by reference. First, Intervenor Plaintiff does not object to the court taking judicial notice of the Local Coverage Determination (LCD-L36668) (Workman Exhibit 1, Soloniuk Exhibit 3), because courts take judicial notice of LCDs. (Doc. Nos. 71 at 2; 73 at 3) (citing *United States ex rel. Groat v. Bos. Heart Diagnostics Corp*., 255 F. Supp. 3d 13, 24 n.7 (D.D.C.), *amended on reconsideration in part*, 296 F. Supp. 3d 155 (D.D.C. 2017) (taking judicial notice of the local coverage determinations in False Claims Act case involving Medicare reimbursement claims); *U.S., ex rel. Modglin v. DJO Glob. Inc*., 114 F. Supp. 3d 993, 1002 (C.D. Cal. 2015), *aff'd sub nom. United States v. DJO Glob., Inc*., 678 F. App'x 594 (9th Cir. 2017) (same)). Accordingly, the court will take judicial notice of the LCD, the contents of which are not in dispute. Second, Intervenor Plaintiff does not object to the court taking judicial notice of the availability of Medicare billing data on reliable internet websites, including the Medicare website run by the government (Soloniuk Exhibit 8), and the data set treatment tracker on the ProPublica news website (Soloniuk Exhibit 9), as those are properly the subject of judicial notice. (Doc. No. 73 at 4.) The court agrees. *See Mack v. S. Bay Beer Distribs., Inc*., 798 F.2d 1279, 1282 (9th Cir. 1986), *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991) ("[A] court may take judicial notice of 'records and reports of administrative bodies.'") (citation omitted). Third, Intervenor Plaintiff does not object to the court incorporating by reference the medical records of two patients whose cases and records are discussed extensively in the complaint (Workman Exhibits 4 and 5, Soloniuk Exhibits 4 and 5) as those records are properly incorporated by reference. (Doc. Nos. 71 at 3–4; 73 at 3–4). Similarly, Intervenor Plaintiff does not object to the court incorporating by reference a draft version of Defendant's 2015 clinic study

[3] Many of the documents in Defendants' requests overlap, but Defendants do not utilize the same exhibit numbering. Thus, in this order, the exhibits to the request filed by Defendant Workman and Defendant Clinic will be referred to as "Workman Exhibit [number]," and the exhibits attached to the request filed by Defendant Soloniuk will be referred to as "Soloniuk Exhibit [number]."

(Workman Exhibit 9, Soloniuk Exhibit 11), "[b]ecause the Complaint extensively refers to a version of this document." (Doc. Nos. 71 at 5; 73 at 5.) Further, Intervenor Plaintiff does not object to the court incorporating by reference email correspondence dated December 2, 2015 (Workman Exhibit 2) because the CII repeatedly refers to those emails. (Doc. No. 71 at 2.) Accordingly, the court will consider the two patients' medical records, the clinic study, and the email correspondence dated December 2, 2015, as incorporated by reference but will not resolve any factual disputes regarding the parties' characterizations and interpretations of those documents.

Intervenor Plaintiff does, however, oppose Defendants' requests to incorporate by reference several documents that are not referenced in the CII let alone necessarily relied upon therein. Specifically, Intervenor Plaintiff objects to the court incorporating by reference the email correspondence dated December 17, 2015 (Workman Exhibit 3), because those emails are not mentioned in the complaint, and they are a separate email chain from the correspondence dated December 2, 2015, that is referred to repeatedly in the CII. (Doc. No. 71 at 3.) Similarly, Intervenor Plaintiff objects to the court incorporating by reference an email chain dated April 17–19, 2018, involving Defendants, their outside billing consultant, and a Noridian employee (Workman Exhibit 8, Soloniuk Exhibits 6 and 7) because those emails are also not referenced in the CII, let alone relied upon in the CII. (Doc. Nos. 71 at 5; 73 at 4). Further, Intervenor Plaintiff objects to the court incorporating by reference a letter from Noridian dated December 4, 2017 (Workman Exhibit 7), because the CII does not mention any letters from Noridian, nor rely upon this particular letter. (Doc. No. 71 at 4.) Notably, in requesting the court consider these documents, Defendants represent that these documents are "materials referred to in the CII and that are relied upon by the United States of America and Relator," (Doc. No. 61 at 3), and are documents "referenced, but omitted, by the Complaint," (Doc. No. 59 at 4–6). Yet, Defendants do not provide any citations to the complaint to support these representations. Accordingly, the court will deny Defendants' requests as to these documents because Defendants have not shown these documents are appropriately incorporated by reference.

Intervenor Plaintiff also opposes Defendants' request for the court to take judicial notice

or incorporate by reference over 150 pages of materials apparently constituting a conference agenda/program for the "2015 MASCL" [Mass Spectrometry: Applications to the Clinical Lab] conference (Workman Exhibit 10, Soloniuk Exhibit 1) and Defendants' slide deck of the presentation they gave at that conference (Workman Exhibit 11, Soloniuk Exhibit 2). (Doc. Nos. 71 at 5–6; 73 at 2–3.) Defendants seek judicial notice of the conference agenda and the slide deck, but they do not explain why those documents should be judicially noticed, nor what specific facts they seek to be noticed. (Doc. Nos. 59 at 6; 61 at 4.) As Intervenor Plaintiff emphasizes in their opposition to Defendants' requests, the fact that Defendants publicly presented their clinic study at this conference is a fact alleged in the complaint and need not be judicially noticed. (Doc. Nos. 71 at 5–6; 73 at 2–3.) Defendants further request that the conference agenda and slide deck be considered incorporated by reference, but the CII does not mention the conference agenda and slide deck, and Defendants have not explained why the court should consider this voluminous agenda/program and slide deck as incorporated into the CII. Accordingly, the court will deny Defendants' requests as to these documents because Defendants have not shown that either judicial notice or incorporation by reference is appropriate.

Additionally, Intervenor Plaintiff opposes Defendants' request for the court to incorporate by reference an email dated December 20, 2017, in which Defendants' office manager forwards a message from their outside billing consultant (Workman Exhibit 6). (Doc. No. 71 at 4.) However, unlike Intervenor Plaintiff's objections to other documents, this email is specifically mentioned and even quoted in the CII. (*See* Doc. No. 39 at ¶ 95) (alleging that "[i]n December 2017, Medicare Billing Consultant A again explained Noridian's position to the Clinic's staff, including Dr. Workman and Dr. Soloniuk, in clear terms. She told them they needed to stop 'blanket testing' and 'billing the highest definitive code ALWAYS'"). Although Intervenor Plaintiff attempts to downplay the importance of this email and the CII's reliance upon it, the court notes that the CII's introduction section concludes with emphasizing Defendants' knowledge of their illegal conduct and references this specific email. (*See id* at ¶ 7) (alleging "[f]or instance, a Medicare contractor audited the Clinic's claims and delivered a comprehensive presentation to Dr. Soloniuk and Dr. Workman, during which the contractor warned them in no uncertain terms

that they needed to order tests on an individualized basis. Shortly afterward, the Clinic's billing consultant reiterated this rule to Defendants and cautioned them to stop billing the highest level "ALWAYS"). Moreover, in opposing the pending motions, Intervenor Plaintiff argues that the CII sufficiently alleges Defendants' knowledge of the illegality of their scheme and cites this email in support of that argument. (Doc. Nos. 70 at 6, 7, 13; 72 at 6, 7, 13.) Thus, the court finds that the email dated December 20, 2017 is properly incorporated by reference in the CII, and the court will grant Defendant Workman and Defendant Clinic's request that the court consider that document.

Lastly, Defendant Soloniuk apparently requests the court take judicial notice of an email attached as an exhibit to Relator's complaint, (*see* Doc. No. 61 at 2) (listing "Exhibit 10: February 19, 2018 email"), but there are no arguments made in Defendant Soloniuk's request as to Exhibit 10 to support such a request. Moreover, that email is not mentioned in the CII, and thus there is no basis to consider that email incorporated by reference in the CII. Accordingly, Defendant Soloniuk's request as to Soloniuk Exhibit 10 will be denied.

In sum, the request for judicial notice and/or incorporation by reference filed by Defendant Workman and Defendant Clinic (Doc. No. 59) will be granted as to Workman Exhibits 1, 2, 4, 5, 6, and 9, and denied as to Workman Exhibits 3, 7, 8, 10, and 11. Defendant Soloniuk's request for judicial notice and/or incorporation by reference (Doc. No. 61) will similarly be granted as to Soloniuk Exhibits 3, 4, 5, 8, 9, and 11, and denied as to Soloniuk Exhibits 1, 2, 6, 7, and 10.

3. <u>Defendants' Requests Filed Concurrently with Reply Briefs</u>[4]

Defendant Workman and Defendant Clinic filed a request with their reply brief for the court to take judicial notice and/or incorporate by reference five additional exhibits. (Doc. No. 79.) Defendant Soloniuk similarly filed a request for judicial notice along with his reply brief in which he requests the court take judicial notice and/or incorporate by reference two additional exhibits. (Doc. No. 77-1 at 2.) However, none of the additional exhibits are new to Defendants

[4] The exhibits to the requests filed concurrently with Defendants' reply briefs will be referred to as "Workman Reply Exhibit [number]," and "Soloniuk Reply Exhibit [number]," respectively.

such that they could not have been included in the requests they concurrently filed with their motions to dismiss. Moreover, Intervenor Plaintiff relied on the allegations in the CII in opposing the pending motions; Intervenor Plaintiff did not introduce any evidence with their opposition briefs. Thus, these additional exhibits are not offered to rebut evidence raised for the first time by Intervenor Plaintiff in its opposition briefs. These reasons alone are sufficient to deny the requests filed concurrently with the reply briefs. *See AEG Holdco LLC v. Vazquez*, No. 2:21-cv-05290-VAP-AGR, 2021 WL 4859975, at *16 n.11 (C.D. Cal. Sept. 22, 2021) ("declin[ing] to consider Plaintiff's 'new' evidence cited in the Reply because Plaintiffs fail to show it raised it to respond to issues raised in the Opposition or that it was 'unforeseen at the time of the original motion'") (quoting *Burnham v. City of Rohnert Park*, No. 92-cv-1439-SC, 1992 WL 672965, at *1 n.2 (N.D. Cal. May 18, 1992)); *Townsend v. Monster Beverage Corp*., 303 F. Supp. 3d 1010, 1028 (C.D. Cal. 2018) (declining to consider new evidence submitted with reply brief in support of class certification motion where that evidence could have been presented with the moving papers).

Furthermore, only one of the additional documents would be the proper subject of judicial notice: a press release from the United States Attorney's Office in the Eastern District of California dated July 13, 2018, regarding a conviction of a synthetic drug (spice) dealer (Workman Reply Exhibit 4, Soloniuk Reply Exhibit 2). However, Defendants do not specify what fact or facts from this press release they seek the court to judicially notice. The remaining additional exhibits consist of portions of deposition transcripts and associated deposition exhibits (Workman Reply Exhibits 1–3, 5) and the entire transcript of Defendant Soloniuk's deposition (Soloniuk Reply Exhibit 1). But Defendants offer no argument or authority to support the court incorporating by reference deposition transcripts merely because the CII alleges that Defendants Workman and Soloniuk each admitted under oath certain admissions. *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (explaining that a complaint's "mere mention of the existence of a document is insufficient to incorporate the contents of a document."). The court appreciates that Defendants intend to rely on portions of those transcripts to tell their version of the events and present a defense to the claims brought against them in the CII, but that is

insufficient to warrant the court incorporating those deposition transcripts into the complaint by reference. As the Ninth Circuit has explained,

> [I]f the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint. Otherwise, defendants could use the doctrine to insert their own version of events into the complaint to defeat otherwise cognizable claims.

*See Khoja*, 899 F.3d at 1002 (explaining that "the doctrine is not a tool for defendants to short-circuit the resolution of a well-pleaded claim").

For these reasons, the request for judicial notice filed by Defendant Workman and Defendant Clinic with their reply brief (Doc. No. 79) and the request for judicial notice filed by Defendant Soloniuk with his reply brief (Doc. No 77-1) will both be denied.

**B. False Claims Act (Claims One and Two)**

Under the FCA, liability for a civil penalty and damages attaches to any person who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . ." 31 U.S.C. § 3729(a)(1). The FCA defines "knowingly" to "mean that a person, with respect to information--(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Moreover, "proof of specific intent to defraud" is not required. 31 U.S.C. § 3729(b)(1)(B). The term "material" is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Thus, "[t]he essential elements of an FCA claim are (1) a false statement or fraudulent course of conduct, (2) made with requisite scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States v. Corinthian Colleges*, 655 F.3d 984, 992 (9th Cir. 2011).

Because *qui tam* actions under the FCA involve allegations of fraud, plaintiffs "must meet not only the [plausibility] requirement of [Federal Rule of Civil Procedure] 8, but also the particularity requirements of Rule 9." *Id.* (citing Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."));

*see also Integra Med Analytics LLC v. Providence Health & Servs.*, 854 F. App'x 840, 843 (9th Cir. 2021) ("Rule 8(a) requires the pleading contain a plausible claim for relief, and Rule 9(b) imposes a heightened requirement of particularity."). Under Rule 9(b), "[a]verments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *United States ex rel. Mateski v. Raytheon Co.*, 745 F. App'x 49, 50 (9th Cir. 2018) (citation omitted). However, "Rule 9(b) requires only that the *circumstances of fraud* be stated with particularity; other facts may be plead generally, or in accordance with Rule 8." *Corinthian Colleges*, 655 F.3d at 992.

Here, Intervenor Plaintiff's first FCA claim is brought under 31 U.S.C. § 3729(a)(1)(A) for "presenting or causing to be presented false claims." (Doc. No. 39 at 23.) Specifically, Intervenor Plaintiff alleges that each Defendant "violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting or causing to be presented, false or fraudulent claims for payment or approval to [Centers for Medicare and Medicaid Services ("CMS")] for excessive and medically unnecessary urine drug tests, in violation of the Medicare program's regulations and policies, which Defendants agreed to and were obligated to comply with." (*Id.* at ¶ 138.) Intervenor Plaintiff further alleges that "Defendants' false claims were material to Medicare's payment decisions, and their violations of 31 U.S.C. § 3729(a)(1)(A) resulted in their receiving Medicare payments from CMS to which they were not entitled." (*Id.*)

Intervenor Plaintiff's second FCA claim is brought under 31 U.S.C. § 3729(a)(1)(B) for "making or using false statements." (*Id.* at 24.) Specifically, Intervenor Plaintiff alleges that each Defendant "violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, and causing to be made or used, false records or statements material to false or fraudulent claims resulting in their receiving Medicare payments from CMS to which they were not entitled," and "[t]hose false records or statements were material to Medicare's payment decisions." (*Id.* at ¶ 141.)

In the pending motions to dismiss, Defendants contend that the CII does not adequately plead facts sufficient to allege the FCA's essential elements of falsity, scienter, or materiality, and they argue that the FCA claims are statutorily barred. (Doc. Nos. 60 at 12, 17; 58 at 11, 20.) However, in making this contention, Defendants largely ignore the allegations in the CII and

focus instead on their counter-allegations presenting their version of the events, which is not proper at the pleadings stage.

As for the first element, "a false statement or fraudulent course of conduct," the court finds Intervenor Plaintiff alleges facts with particularity as to Defendants' fraudulent scheme to receive more money from Medicare by submitting urine drug test reimbursement claims that violated Medicare requirements. As alleged in the CII,

> [t]o participate in the Medicare program, Defendants were required to and did submit a Medicare Enrollment Application. Medicare regulations require providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations. 42 C.F.R. § 424.516(a)(1). In the Enrollment Application, an authorized official from the provider must sign the "Certification Section," which "legally and financially binds [the] supplier to all of the laws, regulations, and program instructions of the Medicare program." *See, e.g.*, Form CMS-855A. Officials for the Clinic signed the certification statement, indicating that Defendants understood Medicare laws, regulations, and program instructions and promised to comply with them.

(Doc. No. 39 at ¶ 24.) Medicare pays for covered diagnostics laboratory testing, like urine drug testing, but "no payment may be made under [Medicare] . . . for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury . . . ." (Doc. No. 39 at ¶ 28–29) (quoting 42 U.S.C. § 1395y(a)(1)(A)). For diagnostic tests to be reimbursable pursuant to Medicare regulations, 42 C.F.R. § 410.32(a), the tests "must be ordered[5] by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." (Doc. No. 39 at ¶ 30.) Further, as alleged in the CII,

> [i]n order to assess whether laboratory diagnostic services are reasonable and necessary and whether reimbursement is permitted, Medicare requires proper and complete documentation of the services rendered to beneficiaries. 42 U.S.C. § 1395l(e); *see also* 42 U.S.C. § 1395u(c)(2)(B)(i) ("The term 'clean claim' means a claim

[5] An "order" is defined as "a communication from the treating physician/practitioner requesting that a diagnostic test be performed for a beneficiary . . . . [T]he physician must clearly document, in the medical record his or her intent that the test be performed." (Doc. No. 39 at ¶ 31) (quoting MPBM, Ch. 15, Section 80.6.1).

> that has no defect or impropriety (including any lack of any required substantiating documentation).”). Critically, Medicare regulations expressly state that a laboratory’s claim for a service will be denied if there is not sufficient documentation in the patient’s medical record to establish that the service was reasonable and necessary. 42 C.F.R. § 410.32(d)(3).

(*Id.* at ¶ 33.)

Importantly, “[a] claim under the FCA can be based on the allegation that a party has falsely certified compliance with a statute or regulation as a condition to government payment. *Corinthian Colleges*, 655 F.3d at 992. “[A] false certification of medical necessity can give rise to FCA liability.” *Winter ex rel. United States v. Gardens Reg’l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1118 (9th Cir. 2020), *cert. denied sub nom. RollinsNelson LTC Corp. v. United States ex rel. Winters*, 141 S. Ct. 1380 (2021). Further, “[t]he false statement need not deal with purely objective facts, but rather can involve a subjective opinion or an expression of clinical judgment.” *Holzner v. DaVita Inc.*, No. 21-55261, 2022 WL 726929, at *1 (9th Cir. Mar. 10, 2022) (citing *Winter*, 953 F.3d at 1119). Thus, a physician’s “opinion or certification that a certain treatment or service is medically necessary can be false or fraudulent ‘if the opinion is not honestly held, or if it implies the existence of facts—namely, that [the service] is needed to diagnose or treat a medical condition, in accordance with accepted standards of medical practice—that do not exist.’” *Id.* (quoting *Winter*, 953 F.3d at 1119).

Against this regulatory backdrop, the court finds Intervenor Plaintiff sufficiently pleads that Defendants’ claims for reimbursement were false/fraudulent based on the CII’s allegations that: (i) Defendants utilized “filler” drugs in order to test for the same twenty-two drug classes and obtain the highest reimbursement rate, even though testing for these drugs was not medically “reasonable and necessary” for every patient’s “specific medical problem”; (ii) Defendants utilized pre-filled order forms with the highest reimbursement code (G0483) as the only option and required their employees to use those pre-filled forms, ensuring that every Medicare patient tested with a urine drug test received a test for all twenty-two drug classes, regardless of the individualized need of the patient; and (iii) Defendants did not document in the patients’ records why testing for the same twenty-two drug classes was medically reasonable and necessary to

diagnose and treat each individual patient's specific medical need, particularly where no patient had tested positive for some of the filler drugs (e.g., Spice and PCP). Moreover, the CII alleges in detail how Defendants' testing for filler drugs and use of pre-filled order forms means their testing practices violate the LCD's requirements regarding screen test and definitive tests, as they ran the screen test simultaneously with the blanket definitive test for the 22 drug classes, rather than await the results of the screen test before deciding whether to order definitive testing. Taken together, Intervenor Plaintiff's allegations are sufficient to allege the falsity of Defendants' statements in their claims for reimbursement. *See Winter*, 953 F.3d at 1118 ("We are not alone in concluding that a false certification of medical necessity can give rise to FCA liability.") (citing *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 743 (10th Cir. 2018) (holding that "a doctor's certification to the government that a procedure is 'reasonable and necessary' is 'false' under the FCA if the procedure was not reasonable and necessary under the government's definition of the phrase.")). In *Winter*, the Ninth Circuit also adopted the reasoning of the Fifth Circuit's decision in *U.S. ex rel. Riley v. St. Luke's Episcopal Hospital*, 355 F.3d 370 (5th Cir. 2004), "that because the complaint alleged that the defendants ordered medical services 'knowing they were unnecessary,' the statements were lies, not simply errors." *Winter*, 953 F.3d at 1118 (quoting *Riley*, 355 F.3d at 376).

As for the second element—that the false claims were made with the requisite scienter—here too the court finds the CII's allegations are sufficient to state this element. Intervenor Plaintiff alleges actual knowledge of the falsity of the information in the reimbursement claim (i.e., the representation that testing for 22 classes of drugs was medically reasonable and necessary for the individualized need of the patient tested) by alleging that: "Dr. Soloniuk admitted under oath that he did not individually decide which specific drugs to test for on the definitive tests that he ordered" (Doc. No. 39 at ¶ 68); "Dr. Soloniuk and Dr. Workman each admitted under oath that they knew the use of a prefilled form was inappropriate" (*id.* at ¶ 78); and "Dr. Workman admitted under oath that he did not individually assess or adequately document the reason why testing for such a broad range of drugs was reasonable and necessary for each patient's unique circumstances" (*id.* at ¶ 88). Further, Intervenor Plaintiff alleges that

Defendants knew they were violating Medicare's requirements that definitive testing be based on the specific patient's medical need and documented in the patient's medical records, because the scheme they devised and implemented required testing Medicare patients for exactly the number of drug classes that would maximize the reimbursement rate, irrespective of their medical need and without any explanation as to why testing for those twenty-two classes of drugs was medically reasonable and necessary. That is, in the absence of substantiating documentation in the patient medical records, as is required under the Medicare reimbursement regulations and the LCD, Defendants knew that they could not properly bill Medicare for these urine drug tests. And yet, through implementation of their scheme between the years 2016 and 2018, Defendants "in fact tested for twenty-two classes of drugs in 99.77% of the urine drug tests it administered to Medicare patients and billed to Medicare." (*Id.* at ¶ 60.) Further, as alleged in the CII, Defendants submitted all of their claims for urine drug testing reimbursement to Noridian, and in doing so, certified that they complied with Medicare's requirements. Thus, Intervenor Plaintiff has sufficiently alleged the requisite scienter.

As for the third and final challenged[6] element—materiality—the court likewise finds that Intervenor Plaintiff's allegations are sufficient to state that element. As noted above, "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). "[M]ateriality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'" *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 193 (2016). "For a false statement to be material, a plaintiff must plausibly allege that the statutory violations are 'so central' to the claims that the government 'would not have paid these claims had it known of

---

[6] Defendants do not challenge the sufficiency of the CII's allegations as to the fourth element of the FCA claims, i.e., that the false statement caused "the government to pay out money or forfeit moneys due." *Corinthian Colleges*, 655 F.3d at 992. Nevertheless, the court notes that the CII alleges the "United States paid for thousands of false and fraudulent claims for non-covered tests that Defendants knowingly submitted in violation of Medicare's requirements." (Doc. No. 39 at ¶ 106.) The CII also alleges as illustrative examples that Defendants were reimbursed $2,757.25 for urine drug tests of 13 patients conducted on March 22, 2017, and they were reimbursed $4,315.79 for urine drug tests of 19 patients conducted on April 3, 2017 (*id.* at ¶ 128).

these violations.'" *Winter*, 953 F.3d at 1121 (quoting *Escobar*, 579 U.S. at 196). "[W]hen evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." *Escobar*, 579 U.S. at 194. In the context of Medicare reimbursements for diagnostic and treatment services, the Ninth Circuit has held that "a false certification of medical necessity can be material" and explained that "[t]he medical necessity requirement is not an 'insignificant regulatory or contractual violation.'" *Winter*, 953 F.3d at 1122 (quoting *Escobar*, 579 U.S. at 196). The Ninth Circuit emphasized that "Congress *prohibited* payment for treatment 'not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.'" *Winter*, 953 F.3d at 1122 (quoting 42 U.S.C. § 1395y(a)(1)(A)) (emphasis in original). Thus, the court finds that Intervenor Plaintiff has sufficiently alleged materiality in the CII.[7]

In sum, the court finds that Intervenor Plaintiff has sufficiently alleged the requisite elements for its FCA claims. Defendants' arguments to the contrary in their motions to dismiss are unavailing because they largely rely on extraneous information, and while the evidence they anticipate using in their defense is appropriately submitted to the court at summary judgment, Defendants' evidence and their arguments relying thereon are not appropriate at the pleadings stage. *See Corinthian Colleges*, 655 F.3d at 998; *see also United States ex rel. Johnson v. Kelly*, No. 20-cv-00018-JD, 2024 WL 1862183, at *11 (W.D. Okla. Apr. 29, 2024) (declining to consider extraneous information and summary judgment arguments in a case involving Medicate urine drug test reimbursement because "centrality to a defense—rather than a claim—does not permit the court to consider material outside of the pleadings") (citation omitted). Even for the documents that the court has judicially noticed or incorporated by reference, Defendants' arguments are not persuasive. For example, the court has considered the LCD and the medical records of the two patients discussed in the CII. Referring to those documents, Defendants argue

---

[7] Notably, Defendants' only argument that the CII does not sufficiently allege materiality relies on a document that the court is not considering because Defendants' request for judicial notice as to that document is being denied. (*See* Doc. Nos. 58 at 18; 60 at 17.)

that their testing practices complied with the LCD because they randomly tested chronic opioid therapy patients at the frequencies indicated in the LCD. (Doc. Nos. 58 at 12–16; 60 at 12–15.) But the frequency and randomized timing of those tests is not the basis of Intervenor Plaintiff's falsity allegations. Further, Defendants do not argue nor point the court to language in the LCD to show that providers of care to chronic opioid therapy patients are excused from the requirement of documenting the medical necessity of definitive testing in the patient's medical record. For these reasons, Defendants have not satisfied their burden of showing that the allegations in the CII and undisputed facts drawn from documents properly incorporated by reference and judicially noticed—when viewed in the light most favorable to CII—fail to state a cognizable FCA claim. Therefore, Defendants' motions to dismiss the FCA claims on the ground that the CII fails to state a cognizable claim for relief will be denied.

Defendants also argue in their motions to dismiss that the FCA claims fail because those claims are subject to the statutory public disclosure bar. (Doc. Nos. 58 at 20–24; 60 at 17–22.) Specifically, Defendants cite to 31 U.S.C. § 3730(e)(4), which states:

> [t]he court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C.A. § 3730(e)(4). Here, as Intervenor Plaintiff emphasizes in its opposition, the government opposes dismissal, indeed the United States intervened in this case; thus, this statutory bar does not apply in this case. (Doc. No. 72 at 14.) Implicitly conceding as much, Defendant Soloniuk does not address the public disclosure bar in his reply brief. Defendant Workman and Defendant Clinic, on the other hand, address the public disclosure bar in their reply brief by asserting that the FCA does not give the government "a limitless power to prevent

dismissal of a private FCA claim." (Doc. No. 78 at 7–8.) But they do not rebut the fact that Intervenor Plaintiff's FCA claims are not subject to dismissal under the statute's public disclosure bar, by the statute's own terms. Thus, Defendants' motions to dismiss the FCA claims on the ground that they are statutorily barred will also be denied.

**C. Payment By Mistake and Unjust Enrichment (Claims Three and Four)**

Defendants move to dismiss Intervenor Plaintiff's common law claims for payment by mistake and unjust enrichment on the grounds that those claims are equitable and quasi-contractual in nature, and here Intervenor Plaintiff has a legal remedy under the FCA and contract law based on the parties' contractual agreement for Medicare reimbursements. (Doc. Nos. 58 at 24; 60 at 23–26.) Defendants' arguments are not persuasive in this case because Intervenor Plaintiff is the government, not a private party, and Intervenor Plaintiff alleges violations of federal regulations, not just violations of contract. *See United States ex rel. Osinek v. Permanente Med. Grp., Inc.*, 640 F. Supp. 3d 885, 914 (N.D. Cal. 2022) (denying motion to dismiss the government's payment by mistake and unjust enrichment claims in case brought against a healthcare provider for allegedly submitting false claims for Medicare payment "because the government has not simply alleged the violation of the CMS/Kaiser contract but also the violation of federal regulations," and "the government persuasively argues that, even if a quasi-contract claim might ordinarily be barred where an express contract exists, its claim is unique precisely because the government is involved"); *see also United States v. Wurts*, 303 U.S. 414, 415 (1938) ("The Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid."); *Agility Public Warehousing Co. K.S.C.P. v. United States*, 969 F.3d 1355, 1365 (Fed. Cir. 2020) ("[T]he United States may exercise its '[well]-established right to sue for money wrongfully or erroneously paid from the public treasury,' a right arising separate and apart from statute, regulation, or contract.") (quoting *Wurts*, 303 U.S. at 415).

Moreover, the out-of-circuit cases relied upon by Defendants are not particularly helpful to Defendants' argument or relevant to this case. For example, in *United States v. Fadul*, 11-cv-0385-DKC, 2013 WL 781614, *14 (D. Md. Feb. 28, 2013), the district court granted summary judgment on the government's payment by mistake claim and simply did not address the unjust

enrichment claim because that claim sought the same relief that the court had just awarded for the payment by mistake claim. In *United States v. Albinson*, No. 09-cv-1791-DRD, 2010 WL 3258266, at *19 (D.N.J. Aug. 16, 2010), the court dismissed the government's unjust enrichment and payment by mistake claims because the government failed to allege that Defendant actually received money from the government, not because the government also brought FCA claims. Notably, contrary to Defendants' argument that the government cannot maintain FCA claims and common law claims for payment by mistake and unjust enrichment, the court in *Albinson* dismissed those common law claims with leave to amend so the government could cure the pleading deficiency. *See Albinson*, 2010 WL 3258266, at *19. Lastly, in *United States v. United Techs. Corp.*, No. 3:99-cv-093, 2012 WL 2263280, at *8 (S.D. Ohio June 18, 2012), aff'd, 782 F.3d 718 (6th Cir. 2015), there were no FCA claims brought, and the court found the defendant liable on the government's claims for both unjust enrichment and payment by mistake.

Accordingly, the court will deny Defendants' motions to dismiss the common law claims of payment by mistake and unjust enrichment.

## CONCLUSION

For the reasons explained above,

1. Defendant Workman's and Defendant Clinic's request for judicial notice filed with their motion (Doc. No. 59) is GRANTED IN PART as to Workman Exhibits 1, 2, 4, 5, 6, and 9, and is otherwise DENIED;
2. Defendant Soloniuk's request for judicial notice filed with his motion (Doc. No. 61) is GRANTED IN PART as to Soloniuk Exhibits 3, 4, 5, 8, 9, and 11, and is otherwise DENIED;
3. Defendant Workman's and Defendant Clinic's request for judicial notice filed with their reply brief (Doc. No. 79) is DENIED;
4. Defendant Soloniuk's request for judicial notice filed with his reply brief (Doc. No 77-1) is DENIED;
5. Defendant Workman's and Defendant Clinic's motion to dismiss (Doc. No. 58) is DENIED; and

6. Defendant Soloniuk's motion to dismiss (Doc. No. 60) is DENIED.

IT IS SO ORDERED.

Dated: **September 30, 2026**

Dena Coggins
United States District Judge